**No.** 2:22-cv-01126-APG

# In the
# United States District Court
# District of Nevada

In re WILLIE N. MOON AND
ADNETTE M. GUNNELS-MOON,
*Debtors.*

RUSHMORE LOAN MANAGEMENT SERVICES, LLC
*Appellant /Cross-Appellee*

— v. —

WILLIE N. MOON AND
ADNETTE M. GUNNELS-MOON,
*Appellees /Cross-Appellants*

APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEVADA
Case No. 13-12466-MKN

**APPELLEES' ANSWERING BRIEF AND
CROSS-APPELLANTS OPENING BRIEF**

CHRISTOPHER P. BURKE, ESQ.
Nevada Bar No.: 004093
atty@cburke.lvcoxmail.com
218 S. Maryland Parkway
Las Vegas, NV 89101
(702) 385-7987
Attorney for Appellees/Cross-Appellants
WILLIE N. MOON AND
ADNETTE M. GUNNELS-MOON,

**TABLE OF CONTENTS**

# Appeal

Table of Authorities........................................................ ii

I Overview of the Appeal................................................. 1

II Introduction........................................................... 2

     Statement of Facts................................................ 5

III Issues................................................................ 5

IV Argument............................................................. 6

     A. The punitive damage's award was constitutional............... 6

          1. Degree of reprehensibility................................. 6

          2. Ratio between punitive damages award and compensatory
             damages........................................................ 10

          3. The actual damages awarded to Adnette Moon was *not*
             substantial.................................................... 11

          4. Penalties in comparable cases.......................... 13

     B. The attorney's fee awarded is proper...................... 16

          1. Prevailing party....................................... 18

          2. Attorney's fees are also permitted for unsuccessful
             related claims. Here the Bankruptcy Court specifically
             held the Moons' claims were "inextricably linked"........ 22

          3. The attorney fee award was reasonable regardless of

Adnette Moon's damages award. . . . . . . . . . . . . . . . . . . . . . . . 30

C. Rushmore's new issue is waived. . . . . . . . . . . . . . . . . . . . . . . . . . . 32

D. There is no reason to withdraw the reference. . . . . . . . . . . . . . . . . 34

VIII Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**Cross-Appeal**

I Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

II Issues.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

III Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

IV Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

1. Willie Moon has standing for 362(k) damages.. . . . . . . . . . . . . . . 38

A. Contrary to the BAP's holdings Willie Moon has standing

on several grounds. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

(i) Willie Moon is an individual and a debtor. . . . . . . . . 39

(ii) Willie Moon has standing under the Bankruptcy

Code to rely on the automatic stay. . . . . . . . . . . . . . . 41

B. Willie Moon's income is property of the estate. . . . . . . . . . . 43

(1) Reconciliation approach. . . . . . . . . . . . . . . . . . . . . . . 46

(2) Estate termination approach. . . . . . . . . . . . . . . . . . . . 50

(3) Estate transformation approach. . . . . . . . . . . . . . . . . 51

2. Rushmore's continuing stay violation.. . . . . . . . . . . . . . . . . . . . . . 55

3. Rushmore should be charged with knowledge of the discharge on the date it was entered because of its willful blindness.. . . . . . 56

    A. Rushmore's willful blindness.. . . . . . . . . . . . . . . . . . . . . . . 56

    B. Constructive notice can be actual notice. . . . . . . . . . . . . . . 59

IV Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

# TABLE OF AUTHORITIES

**Cases:**                                                                      **pg.**

*Action Marine, Inc. v. Continental Carbon, Inc.* 481 F.3d 1302
(11th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Ah Quin v. Cnty. of Kauai Dept. of Transp.*, 733 F.3d 267 (9th Cir. 2013). . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564 (1985). . . . . . . . . . 38

*Annese v. Kolenda,* 212 B.R. 851 (W.D.Mich.1997). . . . . . . . . . . . . . . . . . . 44

*Arizona v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014). . . . . . . . . . . . . . . 11

*Armstrong v. Rose Law Firm, P.A.*, 2003 WL 31050583(D. Minn. Sept.
5, 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296 (2017). . . . . . . . 42

*Bank of Marshaltown, Iowa v. Neiman*, 1 F.3d 687 (8th Cir. 1993). . . . . . 44

*Bank of New York Mellon v. 732 Hardy Way Trust*, 4 F.4th 1229 (9th Cir.
2021). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Barbosa v. Solomon*, 235 F.3d 31 (1st Cir. 2000). . . . . . . . . . . . . . . 44, 46, 49

*Barnes v. Logan*, 122 F.3d 820 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . 16

*Bennett v. Spear*, 520 U.S. 154 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Blixeth v. Yellowstone Mountain Club, LLC*, 854 F.3d 626 (9th Cir. 2017). . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc.*, 801 F.3d
347 (3d Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Brandt v. Superior Court*, 37 Cal. 3d 813 (1985). . . . . . . . . . . . . . . . . . . . . 32

*Buckhannon Board Care Home v. West Va. D-H. H.R.*, 532 U.S. 598 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Cabrales v. County of Los Angeles*, 935 F.2d 1050 (9th Cir. 1991).. . . . . . . 25

*Cf. Global-Tech Appliances, Inc. v. SEB S. A.*, 563 U.S. 754 (2011). . . . . . 57

*City of Riverside v. Rivera*, 106 S.Ct. 2686 (1986). . . . . . . . . . . . . . . . . . . . 30

*Cinevison Corp. v. City of Burbank,* 745 F.2d 560 (9th Cir. 1984).. . . . . . . 27

*Clark v. Chrysler Corp.*, 436 F.3d 594 (6th Cir. 2006). . . . . . . . . . . . . . . . . 7

*Clausen v. Icicle Seafoods*, Inc. 272 P.3d 837 (Wash. 2012). . . . . . . . . . . . 31

*Commissioner v. Jean* 496, U.S. 154 (1990). . . . . . . . . . . . . . . . . . . . . . . . . 22

*Continental Trend Resources Inc. v. OxyUSA, Inc.*, 101 F.3d 634 (10th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424 (2001). . 7

*Davis v. County of Los Angeles*, 8 E.P.D. ¶¶ 9444 at 5049 (C.D. Cal.1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Deters v. Equifax Credit Info. Serv. Inc.*, 202 F.3d 1262 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*e.g., Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc.*, 801 F.3d 347 (3d Cir.2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Easley v. Collection Services of Nevada,* 910 F.3d 1286 (9th Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 16, 17

*Equal Employment Opportunity Comm'n v. Fed. Express Corp.*, 513 F.3d 360 (4th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

v

*Farrar v. Hobby*, 506 U.S. 103 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115 (9th Cir. 2000). . . . . . . . . . . . . . . . . 19

*Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.*, 244 F. App'x 424
 (3rd Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Gates v. Deukmejian*, 987 F.2d 1392 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . 28

*Gibson v. Moskowitz*, 523 F.3d 657 (6th Cir.2008). . . . . . . . . . . . . . . . . . . . . 13

*Gradisher v. Check Enforcement Unt.*, 2003 WL 187416 (W.D. Mich. Jan.
22, 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Greater Los Angeles Council on Deafness v. Community Telev. of S.
Cal.*, 813 F.2d 217 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998 (9th
Cir.2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

*Hanrahan v. Hampton*, 446 U.S. 754 (1980). . . . . . . . . . . . . . . . . . . . . . . . . 19

*Hensley v. Eckerhart*, 461 U.S. 424 (1983). . . . . . . . . . . . . 21, 22, 23, 25, 29

*Hewitt v. Helms*, 482 U. S. 755 (1987). . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21

*In re Ball*, 185 B.R. 595 (9th Cir. BAP 1995). . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re Bishop* 296 B.R. 890 (Bankr. S.D. Ga. 2003). . . . . . . . . . . . . . . . . . . . . 15

*In re Burba,* 1994 WL 709314, *17 (6th Cir. Nov. 10, 1994). . . . . . . . . . . . 48

*In re Cardelucci*, 285 F.3d 1231 (9th  Cir. 2002).. . . . . . . . . . . . . . . . . . . . . . 26

*In re Chugach Forest Prods.*, Inc., 23 F.3d 241 (9th Cir. 1994). . . . . . . . . . 37

*In re Dawson*, 390 F.3d 1139 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Dawson*, 346 BR 503 (Bankr. N.D. Cal. 2006).. . . . . . . . . . . . . . . . . 29

*In re Fisher,* 203 B.R. 958 (N.D.Ill.1997). . . . . . . . . . . . . . . . . . . . . . . . 47, 53

*In re Globe*, 867 F.2d 556 (9th Cir.1989). . . . . . . . . . . . . . . . . . . . . . . . . . 41

*In re Goldton*, 627 BR 841 (Bankr. D.S.C. 2021). . . . . . . . . . . . . . . . . . . . 44

*In re Heath,* 115 F.3d 521 (7th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . 44, 53

*In re Hutchings*, 348 BR 847 (N.D. Ala. 2006). . . . . . . . . . . . . . . . . . . . . . 33

*In re Int'l Forex of Cal., Inc.*, 247 B.R. 284 (Bankr. S.D. Cal. 2000).. . . . . 40

*In re Jones,* 657 F.3d 921 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . 45, 46

*In re Kortz*, 283 B.R. 706 (Bankr. N.D. O.H. 2002). . . . . . . . . . . . . . . . . . 15

*In re Leeds*, 589 B.R. 186 (Bankr. D. Nev. 2018). . . . . . . . . . . . . . . . . . . . 40

*In re LeGrand*, 612 BR 604 (Bankr. E.D.Cal. 2020). . . . . . . . . . . . . . . . . . 55

*In re Lyubarsky*, 615 BR 924 (Bankr. S.D. Fla. 2020). . . . . . . . . . . . . . . . 14

*In re Moon*, 613 BR 317 (Bankr. D. Nev. 2020). . . . . . . . . . . . . . 1, 24, 28, 38

*In re Moon*, 617 BR at 361 (Bankr. D. Nev. 2020). . . . . . . . . . . 56, 57, 58, 59

*In re Moon*, 642 BR 27 (Bankr. D. Nev. 2022).. . . . . . . . . . . . . . 5, 10, 24, 28

*In re Mwangi*, 764 F.3d 1168 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . 39

*In re Onecast Media, Inc.*, 439 F.3d 558 (9th Cir. 2006).. . . . . . . . . . . . . . 37

*In re Parker*, 2021 WL 1090421 (N.D. Cal. March 22, 2021).. . . . . . . . . . . 30

*In re Pecan Groves*, 951 F.2d 242 (9th Cir. 1991). . . . . . . . . . . . . . . . . . 39, 40

*In re Petruccelli,* 113 B.R. 5 (Bankr.S.D.Cal.1990)................... 44

*In re Retz*, 606 F.3d 1189 (9th Cir. 2010)........................... 38

*In re Reynard,* 250 B.R. 241, 246 (Bankr.E.D.Va. 2000)........... 47, 54

*In re Rodriguez*, 421 BR 356 (Bankr. S.D. Tex. 2009). ............. 48, 51

*In re Roman*, 283 BR 1 (9th Cir. BAP 2002)......................... 17

*In re Thorpe,* 677 F.3d 869 (9th Cir. 2012). ....................... 41, 42

*In re Schwartz-Tallard*, 803 F.3d 1095 (9th Cir. 2015).............. 17, 18

*In re Snowden*, 769 F.3d 651 (9th Cir. 2014)......................... 18

*In re Southern California Sunbelt Developers, Inc.* 608 F.3d 456
(9th Cir. 2010)..................................................... 22

*In re Stinson*, 295 BR 109 (Cir. BAP 2003). ....................... 26, 27

*In re Waldron,* 536 F.3d 1239 (11th Cir. 2008).................. 47, 48, 52

*Intel Corp. Investment Policy Comm v. Sulyma,* 140 U.S. 768 (2020). . . 57

*Jones v. United Parcel Serv.,* 674 F.3d 1187 (10th Cir. 2012). .......... 6, 8

*Kentucky v. Graham*, 473 U.S. 159 (1985)........................... 22

*Kirkpatrick v. Strosberg*, 894 N. E.2d 781 (Ill. App. Ct. 2008).......... 31

*Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 285 F.3d 1146 (9th
Cir.2002). ......................................................... 7

*Leavey v. Unum Provident Corp.*, 295 F. App'x 255 (9th Cir. 2008)...... 15

*Lexmark In'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118
(2014). ........................................................... 42

viii

*Linn v. United Plant Guard Workers*, 381 U.S. 53 (1966). . . . . . . . . . . . . . . 7

*Liteky v. United States*, 510 U.S. 540 (1994). . . . . . . . . . . . . . . . . . . . . . . . . 34

*Lompe v. Sunridge Ptrs., LLC,* 818 F.3d 1041 (10th Cir. 2016).. . . . . . . . . . 12

*Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672 (7th Cir. 2003).. . . . . 14

*Mendez v. Cty. of San Bernardino*, 540 F.3d 1109 (9th Cir.2008).. . . . . . . 15

*Morales v. City of San Rafael*, 96 F.3d 359 (9th Cir. 1996).. . . . . . . . . . . . 30

*Morton v. Mancari,* 417 U.S. 535 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Nadeau v. Helgemoe*, 581 F.2d 275 (1st Cir. 1978).. . . . . . . . . . . . . . . . . . . 21

*Nickerson v. Stonebridge Life Insurance Co.*, 63 Cal. 4th  363 (2016). . . . 32

*Nigh v. Koons Buick Pontiac GMC*, 478 F.3d 1183 (4th Cir. 2007). . . . . . . 31

*Odima v. Westin Tucson Hotel*, 53 F.3d 1484 (9th Cir. 1999).. . . . . . . . . . . 23

*Pavon v. Swift Transp. Co.*, 192 F.3d 902 (9th Cir. 1999). . . . . . . . . . . . 15, 16

*Pit River Tribe v. Burea of Land Mgmt.,* 793 F.3d 1147 (9th Cir. 2015). . . 43

*Planned Parenthood of the Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . 13

*Quicken Loans, Inc. v. Brown*, 737 S.E.2d 640 (W. Va. 2012).. . . . . . . . . . 31

*Riley v. Volkswagen Group of America, Inc.*, 51 F.4th 896 (9th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Schwarz v. Secretary of Health & Human Services*, 73 F.3d 895 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 28

*Shell Oil v. Capital Fin. Servs.*, 170 B.R. 903 (S.D.Tex.1994). . . . . . . . . . . 50

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003). . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8, 10, 11, 12, 13, 14

*Stogsdill v. Healthmark Partners,L.L.C.*, 377 F.3d 827 (8th Cir. 2004). . . 15

*St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533 (5th Cir. 2009). . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Taggart,* 139 S. Ct. 1802. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Telfair v. First Union Mortgage Corp.,* 216 F.3d 1333 (11th Cir.2000). . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 52

*Texas State Teachers Assn. v. Garland Independent School Dist.*, 489
U.S. 782 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Thomas v. City of Tacoma*, 410 F.3d 644 (9th Cir. 2005). . . . . . . . . . . . . . . 23

*Thorne v. City of El Segundo*, 802 F.2d 1131 (9th Cir. 1986). . . . . . . . . . . 28

*Tourgeman v. Collins Fin. Servs. Inc.*, 755 F.3d 1109 (9th Cir. 2014). . . . . 16

*United States*, 510 U.S. 540 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Caldera-Herrera,* 930 F.2d 409 (5th Cir. 1991). . . . . . . . . 49

*United States v. Cavada,* 821 F.2d 1046 (5th Cir. 1987). . . . . . . . . . . . . . . 51

*United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009). . . . . . . . . . . . . . 38

*Watson v. County of Riverside*, 300 F.3d 1092 (9th Cir. 2002). . . . . . . . . . 29

*Webb v. Sloan*, 330 F.3d 1158 (9th Cir. 2003). . . . . . . . . . . . . . . . . 25, 27, 28

*Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510 (9th Cir. 1992). . . . . . . . 32

*Williams v. ConAgra Poultry Co.,* 378 F.3d 790 (8th Cir. 2004). . . . . . . . . 14

*Willow Inn, Inc. v. Public Service Mutual Insurance, Co.*, 399 F.3d 224 (3rd Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

*Zhang v. Am Gen. Seafoods*, 339 F.3d 1020 (9th Cir. 2003). . . . . . . . . . . .  15

**Statutes**

11 U.S.C. §362(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

11 U.S.C. §362(k). . . . . . . . . . . . . . . . . . . . . . . .  3, 5, 16, 17, 18, 36, 37, 39, 60

11 U.S.C. §362(k)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 55

11 U.S.C. §541(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

11 U.S.C.§1109(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

11 U.S.C. §1306(a). . . . . . . . . . . . . . . . . . . . . . . .  44, 46, 47, 51, 52, 53, 54

11 U.S.C. §1306(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

11 U.S.C. §1322(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

11 U.S.C. §1327(b). . . . . . . . . . . . . . . . . . . . . . . . . .  44, 45, 46, 47, 50, 51, 54

# I

## Overview of the Appeal

Initially, the Bankruptcy Court ruled Rushmore violated the automatic stay and discharge injunction against the Moons in their Chapter 13 bankruptcy, because after being informed of the Moons' bankruptcy in a *recorded* call by Willie Moon, per Rushmore's internal policy, it ignored that call as Willie Moon was not on its loan.[1] Thus, it continued to call and send collections letters to the Moons for years.[2] Therefore, the Court awarded actual, emotional distress, and punitive damages for Rushmore's stay violation, but no damages for its discharge violation.[3]

On appeal, the Ninth Circuit Bankruptcy Appellate Panel ("BAP") reversed the Bankruptcy Court and held that Willie Moon, despite being a debtor in the case, did not have standing to receive automatic stay damages.[4] However, Rushmore did not object to his wife Adnette Moon's damages and the BAP left those undisturbed. Overall, the BAP affirmed or remanded most of the Court's other rulings, reversed another appeal in favor of the Moons,

---

1. *In re Moon*, BR 317, 359 (Bankr. Nev. 2020)(transcript of recorded call).
2. *Moon*, 613 BR at 337, 349-50
3. This is one of the Moon's issues on cross-appeal (EOR Vol. II, 'C', p.2, ln.2-5).
4. This is another of the Moon's issues on cross-appeal (EOR, Vol. II, 'C', p.2, ln.2-5).

and remanded the case for the Bankruptcy Court to reconsider the damages.

After remand, in accordance with Ninth Circuit case law, the Bankruptcy Court correctly held that the claims for Rushmore's stay violation and discharge violation were "inextricably linked" and therefore almost all attorney's fees associated with both claims were properly awarded.

Further, the Bankruptcy Court's remand decision again awarded punitive damages against Rushmore. And the Court's 7 times multiplier for punitive damages passes constitutional muster. Besides, the BAP's remand order did not prohibit the Bankruptcy Court from increasing any punitive damage award, if it deemed it warranted.

Finally, prior to this appeal, Rushmore had never contested Adnette Moon's standing or damage award. In fact, Rushmore's briefs on remand acknowledged, affirmed, and acquiesced to her stay violation damage award. Now, for the first time in Rushmore's Opening Brief, it argues there were no pre-litigation damages for Adnette, therefore no attorney's fees should have been awarded. However, Rushmore has waived this issue.

## II

## Introduction

Rushmore's brief opens with the absurd proposition that Adnette's *actual* damage was only $742.10. Therefore, it argues that the Court's punitive

damages award of $500,000 was 674 times that amount (Op. Br. p.4, ln.13, p.20, ln.10). Unfortunately, what Rushmore leaves out of the equation, is that the attorney's fees the Bankruptcy Court properly awarded for Rushmore's admitted stay violation, and the many appeals it took, are *actual* damages under the statute and Ninth Circuit case law. See 11 U.S.C. §362(k); *Easley v. Collection Serv. Nev.*, 910 F.3d 1286, 1292 (9th Cir. 2018).[5]

Since attorney's fees are actual damages, they can be included in determining the court's multiplier for a punitive damage award. Here, the Bankruptcy Court awarded $71,250.04 in attorney fees (EOR Vol. II 'H', p.12, ln.20-24). Therefore, the actual multiplier is only 7 to 1 and constitutionally permissible. If one were to add in the total attorney's fees, including those for the appeals, Adnette Moon's actual damages are $201,728.81, thereby making the punitive damages award only a 2.48 to 1 multiplier.

Further, although the BAP eliminated Willie Moon's damages, it still upheld almost all of the Bankruptcy Court's rulings in favor of the Moons and reversed the Bankruptcy Court's denial of attorney's fees for the Moons having to defend against Rushmore's adversary. Therefore, on remand, the Bankruptcy Court correctly awarded those attorney's fees and considered

---

5. The Moon's filed cross-appeals and prevailed on a separate appeal. (EOR Vol. VIII, 'II', p.15).

those attorney's fees in calculating its punitive damages award.

Finally, Rushmore erroneously states the court should have excluded the attorney time "spent pursuing the Debtor's failed discharge claims and Willies failed stay claims." (Opp. Br. p.4, ln.21-22). However, because the Bankruptcy Court logically held these claims were "inextricably linked", it awarded most of the attorney's fees requested for the work done on both claims, as the Ninth Circuit permits.

In the end, because Rushmore does *not* have any valid arguments on appeal, its brief blames the Moons' attorney for bringing their original motion and not being a "gatekeeper"[6], chastizes Adnette Moon for failing to "mitigate her damages"[7], and claims more than half-a-dozen times that the Bankruptcy Court unfairly "punished" it.[8]  This reveals, that Rushmore's opening brief is short on substance and long on accusations, which does not provide a basis to reverse the Bankruptcy Court decision.

---

6. Op. Br. p.35, ln. 21

7. Op. Br. p.35, ln. 24, p.36, ln.3, (EOR Vol. II, 'H', p.19, fn.31 "Rushmore continues to deny responsibility for its own unwritten undisclosed policy. Instead Rushmore maintains that 'Adnette has never accepted responsibility for her part.'")

8. Op. Br. p.20, ln. 18, 26; p.21, ln.18; p.22, ln.9, 21; p.23, ln.7, 17, 23

## Statement of Facts[9]

On June 13, 2022, the Bankruptcy Court entered its decision after remand (EOR Vol. II 'H'). It noted, that Adnette Moon's $742.10 actual damages award remained and Rushmore had never appealed that ruling (EOR Vol. II 'H', p.4, ln. 14-16). Further, it awarded attorney's fees of $71,250.04 and appellate attorney's fees of $130,478.77 for a total of $201,728.81 in actual damages and $500,000 in punitive damages for Rushmore's reprehensible behavior (EOR Vol. II 'H', p.29, *Moon*, 642 BR at 50).

## III

## Issues

Rushmore's Opening Brief presents three issues. First, Rushmore alleges that the Bankruptcy Court's punitive damages award violated Rushmore's due process rights. However, Rushmore fails to include Adnette Moon's attorney fee damage award, which are *actual* damages under §362(k), in its punitive damages ratio. Second, that the Bankruptcy Court abused its discretion by increasing the punitive damages award after remand, despite the BAP leaving open that possibility.

And third, Rushmore brings up a *new* issue on appeal, that the Bankruptcy Court erred in awarding any attorney's fees based upon allegedly

---

9. The facts are laid out in Bankruptcy Courts Memorandum after Remand *In re Moon*, 642 BR 27, 30-34(Bankr. D. Nev. 2022)(EOR Vol. II, 'H' p. 1-8).

no pre-litigation damages by Adnette Moon. Ironically, Rushmore has already approved, accepted, and admitted that Adnette was entitled to compensatory damages of $742.10 and by not appealing that holding to the BAP. In fact, Rushmore's remand brief welcomed these damages.

## IV

## Argument

## A. The punitive damage's award was constitutional

"[T]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tort feasor." *Jones v. United Parcel Serv.*, 674 F.3d 1187, 1206 (10th Cir. 2012). In reviewing a constitutional challenge to an award of punitive damages under the Due Process Clause of the Fourteenth Amendment, a federal court must "consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mutual Auto Ins. Co. v. Campbell,* 538 U.S. 408, 418 (2003) citing *Gore*, 517 U.S. at 575.

### 1. Degree of reprehensibility

Of the three guideposts, reprehensibility is the most important. See

*State Farm*, 538 U.S. at 419, citing *Gore*, 517 U.S. at 575. Under this guidepost, the factual findings by the trial court is given deference *Clark v. Chrysler Corp.*, 436 F.3d 594, 601 n. 7 (6th Cir.2006) (explaining an appellate court's deference to the district court's factual findings regarding the reprehensibility guidepost); *Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 285 F.3d 1146, 1150 (9th Cir.2002) (observing that in "determining the 'degree of reprehensibility,' " the reviewing court "must accept the underlying facts as found by the jury and the district court"). It is a question of law, and a court is empowered to decide what the maximum permissible amount is without offering a new trial. *Id* 285 F.3d at 1151. Therefore, another remand is not warranted in this case.

Normally, "it is the duty of the trial judge to require a remittitur or a new trial" if "the amount of damages awarded is excessive," *Linn v. United Plant Guard Workers,* 381 U.S. 53, 65-66 (1966). However, this is obviously less of a concern if it is the trial judge determining the punitive damage award as in this case. In contrast, the appellate court is confined to a cold record because it was not at the trial, as the bankruptcy court was. Thus, the bankruptcy court had "a somewhat superior vantage" point to assess reprehensibility. *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 440 (2001). Hence,

the need to defer to the bankruptcy court's factual findings.

In addressing the degree of reprehensibility, courts are to consider the following: (1) whether the harm caused was physical as opposed to economic; (2) whether the defendant acted with indifference or a reckless disregard for the health or safety of others; (3) the financial vulnerability of the plaintiff; (4) whether the defendant's wrongful conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Jones*, 674 F.3d at 1207 (citing *State Farm*, 538 U.S. at 419).

Here, the Bankruptcy Court's holding after remand noted:

> ". . . , the BAP also concluded that Rushmore's institutional policy of disregarding a bankruptcy notice from an 'unauthorized' third party is contrary to the law.'" . . .
>
> Despite what even the BAP described as Rushmore's 'intentional yet flawed institutional policy,' the unintended consequence of the BAP's former conclusion is that Rushmore knowingly and repeatedly contacted a Chapter 13 debtor at his residence without repercussion. As a further consequence, however, the egregiousness of Rushmore's unwritten policy is far worse. As previously discussed at 2, supra, Rushmore contacted the Debtors almost *one hundred times* after receiving notice of the Debtors' bankruptcy proceeding. The same institutional policy permitted Rushmore to deprive Willie Moon of the solace expected from filing for bankruptcy protection. Other than telling Willie Moon that she would "notate it in the account," . . . , Rushmore's representative never informed him that his information would be disregarded as to Adnette Moon because Rushmore's undisclosed policy did not treat him as an authorized third party. Rushmore continued to

contact Willie Moon at his residence in spite of having knowledge that he was in a Chapter 13 proceeding. Willie Moon had no reason to know that his communications with Rushmore would never end the phone calls or other collection activity received at the residence. But despite what Rushmore now was legally permitted to do to Adnette Moon's husband, it was not permitted to do the same to her because Rushmore had notice of her joint Chapter 13 proceeding as of December 20, 2014.

Examining the degree of reprehensibility in this additional light, it is without dispute that Rushmore's institutional policy deprived Adnette Moon of a fundamental bankruptcy protection afforded by the automatic stay: a breathing spell from her creditors while she completed her confirmed Chapter 13 plan. Rushmore's failure to take any steps to ascertain Adnette Moon's bankruptcy status after its representative made a notation to its own records evinced an indifference and disregard for Adnette Moon's bankruptcy rights as acknowledged by Rushmore's own written policy and procedures manual. Unless Rushmore adopted its unwritten policy solely for the Debtors, all similarly situated borrowers with loans serviced by Rushmore would be subject to the same treatment. Rushmore's undisclosed policy itself restricted the sources of information to verify whether borrowers such as Adnette Moon were under bankruptcy protection: the financial vulnerability of borrowers in bankruptcy was demonstrated by the Rushmore's multiple efforts to contact her.

It is clear that the communications with the Debtors between December 20, 2014 and September 28, 2016, were no accident: they occurred because of Rushmore's unwritten, undisclosed institutional policy that allowed it to disregard the information that was provided by Willie Moon. Those communications were not isolated, but repeated: sixty-eight phone calls to the residence, thirty letters to the residence, and even one collection notice physically attached to the door of the Debtors' residence.

- - -

Under these circumstances, Rushmore's failure to investigate its borrower's bankruptcy status after noting the telephone call with the borrower's husband is even more pernicious: the practice impacts all similarly situated borrowers in bankruptcy whose loans

9

are serviced by Rushmore while allowing Rushmore to continue dunning the non-borrower debtor (EOR 'H', p.16, ln.6-16; p.17, ln.1-25; p.18, ln.4-7), *Moon*, 642 BR at 41-42 (emphasis added).

Therefore, in addressing the degree of reprehensibility, the Bankruptcy Court noted the physical nature of the harm in Rushmore giving Adnette no "breathing spell", Rushmore's "indifference and disregard for Adnette Moon's bankruptcy rights" and that its actions were "no accident", that Adnette was "financially vunerab[le]," that Rushmore actions occurred "almost one hundred times", and was the result of Rushmore's "unwritten policy". *Id.*

### 2. Ratio between punitive damages award and compensatory damages

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Gore*, 517 U.S. at 580. The Court has explained that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 425.

The Supreme Court further instructs that these historical ratios "demonstrate what should be obvious," which is that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the [courts] goals of deterrence and retribution." *Id.* This suggests that up to a 9:1 ratio of

10

punitive damages to compensatory damages is likely acceptable in some cases, and that a 10:1 ratio might be permissible because it does not exceed 9:1 to a significant degree.

Nonetheless, the U.S. Supreme "Court has steadfastly refused to create a bright-line ratio and has emphasized that a higher ratio is justified when a particularly egregious act has resulted in only small economic damages." *State Farm*, 538 U.S. at 425. In fact, the Ninth Circuit has approved a 125,000 to one ratio. *See Arizona v. ASARCO*, 733 F.3d 882, 888 (9th Cir. 2013)(zero compensatory damages, nominal damages of $1 and punitive damages of $125,000). And, just last month, the Ninth Circuit affirmed an 8-1 punitive damage ratio. See *Riley v. Volkswagen Group of America, Inc.*, 51 F.4th 896, 904 (9th Cir. 2022). Here, in this case, the ratio is only 7 to 1. Thus, it is in line with the U.S. Supreme Court's guidelines and Ninth Circuit case law.

### 3. The actual damages awarded to Adnette Moon was *not* substantial

The Supreme Court has noted, that "[w]hen compensatory damages are *substantial*, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id*. However, the Supreme Court has *not* defined "substantial" in this context and has been "reluctant to identify concrete constitutional limits on the ratio between harm,

11

or potential harm, to the plaintiff and the punitive damages award." *State Farm*, 538 U.S. at 424 (citing *Gore*, 517 U.S. at 582); see also *Id.* at 425 ("[T]hese ratios are not binding, they are instructive.").

Although the Supreme Court has not defined "substantial" for purposes of compensatory damages, other cases can be instructive. In *State Farm*, for example, the Supreme Court held that a compensatory damages award of $1,000,000 for a year and a half of emotional distress was "substantial." And in cases decided since *State Farm*, compensatory damages have often been considered "substantial" when they are over $1,000,000.[10] Ultimately, "[t]he precise award" of punitive damages "must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *State Farm*, 538 U.S. at 425. Here, the actual damage award was only $71,250.04, *not* including appellate attorney's fees. Besides, even including appellate attorney's fees of $130,478.77, the actual damages award total of $201,728.81 is still *not* a substantial compensatory award. And the resulting 2:48 to 1 punitive damage ratio for the indifferent, maliciousness of Rushmore, does

---

10. See *Lompe v. Sunridge Ptrs., LLC,* 818 F.3d 1041, 1069 (10th Cir. 2016) (noting that other cases draw the "substantial" line at roughly $1,000,000). What counts as substantial depends on the facts of the case, and an award of $400,000 might not mandate a 1:1 ratio on another set of facts. See *Rainey*, 941 F.3d at 255 (upholding 6:1 ratio relative to $1.13 million compensatory award because defendant's conduct was "truly egregious"). Either way, based upon the above cases, the Moons' award of $201,728.81 is *not* substantial.

*not* offend due process.

Besides, some courts have held that even when the compensatory damages are substantial, the constitutionally permissible ratio can far exceed 1-to-1. See, e.g., *Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc.*, 801 F.3d 347, 366 (3d Cir.2015) (concluding that "a 5:1 ratio is not the type of gross disparity between compensatory and punitive damages that renders a punitive award suspect by itself" for a compensatory-damages award of $1.045 million); *Gibson v. Moskowitz*, 523 F.3d 657, 665 (6th Cir.2008) ("[T]he 2 to 1 ratio ... falls well short of the high end of this range and indeed parallels the kind of relationship that the Court has said will often suffice [for a compensatory-damages award of $1.5 million].").[11] Thus, even if $201,728.20 is considered substantial, the Courts 2:48 to 1 still does *not* offend due process.

### 4. Penalties in comparable cases

The third *State Farm* guidepost directs courts to consider the disparity between the punitive-damages award in a case and the civil penalties

---

11. See *Planned Parenthood of the Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949, 962 (9th Cir.2005)(stating that when the award of economic damages is significant, a 4–to–1 ratio is a "good proxy for the limits of constitutionality" if the "behavior is not particularly egregious"); *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015 (9th Cir.2004) (concluding that a 2.6–to–1 ratio is "well within the Supreme Court's suggested range for constitutional punitive damages awards" for a compensatory-damages award of $1.92 million).

authorized or imposed in comparable cases. *State Farm*, 538 U.S. at 418. One comparable case is of *In re Lyubarsky*, 615 BR 924, 939 (Bankr. S.D. Fla. 2020), which awarded $118,259.25 in actual damages and punitive damages of $236,518.50 (2 to 1 ratio) for a total of $354,777.75 for a stay violation.

However, the disparity guidepost is not a mechanical rule. The court must still calculate the ratio to frame its analysis, but the ratio itself does not decide whether the award is permissible. See *Williams v. ConAgra Poultry Co.,* 378 F.3d 790, 799 (8th Cir. 2004) ("It is not that such a ratio violates the Constitution. Rather, the mathematics alerts the courts to the need for special justification."). For instance, in *Mathias v. Accor Economy Lodging,* the Seventh Circuit upheld a 37:1 ratio on $5,000 in compensatory damages and $185,000 in punitive damages. 347 F.3d 672. In *Mathias*, a modest punishment of $185,000 was constitutional, and the high ratio did not undermine that conclusion. *Id.* at 678.

Further, Rushmore's position also neglects the history of cases that counter a low damage award, in deserving situations, by using a large

multiplier to deter a party's reprehensible conduct.[12] In fact, the following ratios have been approved by the Ninth Circuit in comparable cases: *Zhang v. Gem Seafoods, Inc.*, 399 F.d 1020 (9th Cir. 2003)(punitive damages $2,600,000, compensatory damages $360,000, ratio 7.22); *Leavey v. Unum Provident Corp.*, 295 F. App'x 255 (9th Cir. 2008)(punitive damages $3,000,000, compensatory damages $1,400,000, ratio 2.14); *Hangarter v. Provident Life & Accident Ins.Co.*, 373 F.3d 998 (9th Cir. 2004)(punitive damages $5,000,000, compensatory damages $1,920,000, ratio 5.60).[13] Therefore, the bankruptcy court's 7 to 1 (or 2.48 to 1) ratio is not an abuse of discretion.

In the end, this case is most similar to the Ninth Circuit case of *Pavon v. Swift Transp. Co.*, 192 F.3d 902, 906 (9th Cir. 1999) ($251,218)(1.2:1).

---

12.See also *Equal Employment Opportunity Comm'n v. Fed. Express Corp.* 513 F.3d 360, 377-78 (4th Cir. 2008)(upholding a $100,000 punitive damages awarded and an $8,000 compensatory damages award); *Swinton*, 270 F.3d at 819 (upholding a $1,000,000 punitive damages award and a $35,600 compensatory damages award); *Deters v. Equifax Credit Info. Serv. Inc.*, 202 F.3d 1262, 1273 (10th Cir. 2000)(upholding a $295,000 punitive damages award and a $5,000 compensatory damages award). See also *In re Bishop* 296 B.R. 890, 899 (Bankr. S.D. Ga. 2003) (attorney's fees and emotional distress of $6,306.84 and punitive damages of $50,000); *In re Kortz*, 283 B.R. 706, 714 (Bankr. N.D. O.H. 2002)(actual damages of $133.20 and punitive damages of $51,500); *Mendez v. County of San Bernadino* 540 F.3d 1109, 1120-22 (9th Cir. 2008)($5,000 in punitive damages on a nominal damage award).

13. See also, *Stogsdill v. Healthmark Partners,L.L.C.*, 377 F.3d 827 (8th Cir. 2004)(punitive damages $2,000,000, compensatory damages $500,000, ratio 4.00).

*Pavon* held, that "ratio of 250 to 1 between the punitive damages award and plaintiffs's out-of-pocket loss" does not "support a reduction of the award." *Pavon* 192 F3d at 907 (total economic loss was $1,218, $250,000 in noneconomic damages and $200,000 in punitive damages). See also, *Barnes v. Logan*, 122 F.3d 820, 821 (9th Cir. 1997)(affirming an arbitration award of $261,561 in compensatory damages and $250,000 in punitive damages). Here, the court's actual damages award of $201,728.21 is *not* substantial. Thus, the Bankruptcy Court's $500,000 punitive damages award is *not* so grossly excessive as to violate defendant's due process rights, regardless of whether the bankruptcy court's punitive damages award is 7 to 1 ratio or 2:48 to 1.

## B. The attorney's fee award is proper

The Ninth Circuit has emphatically stated that §362(k) is "a fee-shifting provision *rather* than a damages provision." *Easley v. Collection Services of Nevada,* 910 F.3d 1286, 1290 (9th Cir. 2018*)*, citing *Blixeth v. Yellowstone Mountain Club, LLC*, 854 F.3d 626, 629, n.3 (9th Cir. 2017)(emphasis added). The point of a fee shifting statute is to encourage attorneys to act as *private attorney generals* in consumer cases. *Tourgeman v. Collins Fin. Servs. Inc.*, 755 F.3d 1109, 1118 (9th Cir. 2014)(FDCPA).

"Recovery of attorney's fees and costs is especially critical in the bankruptcy context where debtors lack the means to otherwise pursue their damages." *Easley* 910 F.3d at 1291 (9th Cir. 2019). The Ninth Circuit made it clear that "Congress undoubtedly knew that unless debtors could recover the attorney's fees they incurred in prosecuting an action for damages many would lack the means or financial incentive (or both) to pursue such action." *In re Schwartz-Tallard*, 803 F.3d 1095, 1100 (9th Cir. 2015).

"After all, the very class of plaintiffs authorized to sue–individual debtors in bankruptcy–by definition will typically not have the resources to hire private counsel." *Schwartz-Tallard,* 803 F.3d at 1100 "And in many cases the actual damages suffered by the injured debtor will be too small to justify the expense of litigation, even if the debtor can afford to hire counsel." *Id.* Thus, "Congress could not have expected §362(k) to serve as an effective deterrent unless it authorized recovery of attorney's fees incurred in prosecuting an action for damages." *Id.* Therefore, the Court properly shifted the attorney's fees to Rushmore after finding it violated the automatic stay.

Notably, under §362(k) attorney's fees are actual damages. See *In re Roman*, 283 BR 1, 10 (9th Cir. BAP 2002). And attorney's fees are *not* dependent on any *other* damage award. *In re Dawson*, 390 F.3d 1139, 1149

(9th Cir. 2004)("the statute [§362(k)] does not suggest that any one form of damages is dependent on the existence of another form of damages"). "Without a doubt Congress intended §362(k)(1) to permit recovery as damages [attorneys] fees incurred . . ." *In re Snowden*, 769 F.3d 651, 659 (9th Cir. 2014). See 3 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy*, §362.12[3] (16th ed. 2014)("Attorneys fees incurred in prosecuting an action to obtain full relief under the statute, . . ., is . . . a part of the debtor's 'actual damages.' "). Since, the Ninth Circuit allows attorney's fees for prosecuting stay violations the Court's award was proper. *In re Schwartz-Tallard,* 803 F.3d at 1101.

## 1. Prevailing party

Rushmore next complains that the Courts attorney fee award should not have included fees for claims that the Moons did not prevail on (Op. Br. p.36-39). To start with, "the plaintiff must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Texas State Teachers Assn., v. Garland School District*, 489 U.S. 782, 792 (1989). "The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties." *Id.*, at 792.

Under Ninth Circuit law:

"[A] plaintiff `prevails' when actual relief on the merits of his

> claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." The Court explained that "a material alteration of the legal relationship occurs [when] the plaintiff becomes entitled to enforce a judgment, . . . against the defendant." In these situations, the legal relationship is altered because the plaintiff can force the defendant to do something he otherwise would not have to do.

*Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1118 (9th Cir. 2000) (quoting *Farrar v. Hobby*, 506 U.S. 103, 111-12, 113 (1992)). Here, the legal relationship between the Moons and Rushmore was altered by the Court's decision.

Further, the U.S. Supreme Court has noted, that *Black's Law Dictionary* 1145 (7th ed. 1999) defines "prevailing party" as "[a] party in whose favor a judgment is rendered *regardless* of damages awarded. Also termed successful party." *Buckhannon Board Care Home v. West Va. D-H. H.R.*, 532 U.S. 598, 603 (2001). (Emphasis added). "This view that a 'prevailing party' is one who has been awarded some relief by the court can be distilled from our [U.S. Supreme Courts] prior cases." *Id. See Hanrahan v. Hampton*, 446 U.S. 754, 758 (1980); *Hewitt v. Helms*, 482 U.S. 755, 758 (1987) ("a party has prevailed on the merits of at least some of his claims before he can be said to prevail.").

In essence, observing that "[r]espect for ordinary language requires that a plaintiff receive at least *some* relief on the merits of his claim before he can be said to prevail," that the plaintiff proved "the settling of some dispute which

19

affects the behavior of the defendant towards the plaintiff." In *Hewitt,* 482 U.S. at 761. Under this definition, it cannot be seriously argued that the Moons did not prevail on their original contempt motion, and also after remand.

Critically, the U.S. Supreme Court has "held that even an award of nominal damages suffices under this test." *Buckhannon*, 532 U.S. at 604. "The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought." *Farrar v. Hobby*, 506 U.S. 103, 111 (1992).   In fact, "a plaintiff who wins nominal damages is a prevailing party under §1988" *Id* at 112. Because, "[a] judgment for damages in any amount, whether compensatory or nominal modifies the defendant's behavior for the plaintiff's benefit by forcing the defendant to pay an amount of money he otherwise would not pay." *Id* at 113. Thus, according to the U.S. Supreme Court "the prevailing party inquiry does not turn on the magnitude of relief obtained." *Farrar v. Hobby*, 506 U.S. 103, 114 (1992) at 114. In fact, "the *degree* of the plaintiff's success does not affect eligibility for a fee award." *Texas Teachers Assn. v. Garland School District* 489 U.S. 782, 790 (1989).

Stated another way, the plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought. *Hewitt, supra*, at 760. Whatever relief the plaintiff secures must directly benefit him at the time of

the judgment or settlement. See *Hewitt*, supra, at 764. Therefore, under the Supreme Court's "generous formulation" of the term, "plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on *any* significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley*, 461 U. S. at 433 (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278-279 (1st Cir. 1978)). Here, the Moons initially requested actual damages (including emotional distress damages) (granted), punitive damages (granted), and attorney's fees and costs (granted)(EOR Vol. III, 'M', p.16 ln.13-26). *All* were awarded by the Bankruptcy Court and these holdings were affirmed to some degree by the BAP with the amounts to be reviewed on remand. In fact, the BAP vacated and reversed only *one* request outright, the damages for Willie Moon (EOR Vol. III, 'P', p.15-16). Thus, the Moons *prevailed* on four of its five requests at the BAP.

Although Rushmore was able to reverse Willie Moon's emotional distress award, that does not determine the issue. "Where both sides succeeded on significant issues, courts have sometimes awarded full fees even for "partial 'success'" *Greater Los Angeles Council on Deafness v. Community Telev. of S. Cal.*, 813 F.2d 217 (9th Cir. 1987).

In addition, the Moons also prevailed on their Supplemental Attorney's

Fee request at the Bankruptcy Court and on appeal (affirmed) subject to the amount on remand. And the Moons procured a reversal and remand on appeal regarding their attorney's fees request for defending against Rushmore's adversary (EOR Vol. VIII, 'II', p.15). Thus, the Moons had more than partial success. And, "liability on the merits and responsibility for fees go hand in hand" *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Besides, the Supreme Court has held that a prevailing plaintiff under a statute so worded "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983).

## 2. Attorney's fees are also permitted for unsuccessful related claims. Here the Bankruptcy Court specifically held the Moons' claims were "inextricably linked"

The U.S. Supreme Court has "explained that, with respect to fee-shifting statutes, a court should 'treat [ ] a case as an inclusive whole, rather than as atomized line-items." *In re Southern California Sunbelt Developers, Inc.* 608 F.3d 456, 463 (9th Cir. 2010), citing *Commissioner v. Jean,* 496 U.S. 154, 161-62 (1990). Thus, "a fee award presumptively encompasses all aspects of the civil action." *Jean*, 496 U.S. at 161. Further, the U.S. Supreme Court has held, that logically "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain

grounds is not a sufficient reason for reducing a fee" *Hensley* 461 U. S. at 435. Therefore, the "District Court did not err in refusing to apportion the fee award mechanically on the basis of respondents' success or failure on particular issues" *Id* at 438. Thus, "[w]here a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fees reduced simply because the district court did not adopt each contention raised." *Id* at 440.

In determining which claims are related, the focus is on whether the claims that plaintiff did *not* prevail "involve a common core of facts *or* are based on related legal theories." *Thomas v. City of Tacoma*, 410 F.3d 644, 649 (9ᵗʰ Cir. 2005). "To the extent the claims are related, Plaintiff should recover reasonable attorney's fees for prosecuting those claims. However, a determination that certain claims are not related does *not* automatically bar an award of attorney's fees associated with those unrelated claims; work performed in pursuit of unrelated claims may be inseparable from the performed in furtherance of the related or successful claims." *Id* (emphasis added).

In fact, there is a common core of facts and claims are related, if it required virtually the same evidence. *Odima v. Westin Tucson Hotel*, 53 F.3d

1484, 1499 (9th Cir. 1999). That is precisely what happened in this case. The Court noted "[t]here was a core of evidence and facts that produced all of the results of the evidentiary hearing." *Moon,* 642 BR at 36. Here, the Bankruptcy Court held that automatic stay and discharge violations involved a common core of facts and were "inextricably linked" (EOR Vol. II, 'H' p.10, ln. 8-9). As the bankruptcy court noted, the calls and collection letters the Moons received, both during and after, their Chapter 13:

> Automatic Stay
> "Rushmore made hundreds of telephone calls to the Residence . . . [and] transmitted at least fifty Account Information and Mortgage Statements, along with other collection correspondence to the Residence."
>
> (*Moon*, 613 BR at 349).

> Discharge Injunction
> "[A]fter the entry of discharge . . . Rushmore made 52 telephone calls to the Debtors. . . [and] transmitted twenty-six mortgage statements and other collection letters to the Debtors . . ."
>
> (*Moon*, 613 BR at 350-51)

Such a lawsuit *cannot* be viewed as a series of discrete claims. Although the Ninth Circuit has "acknowledged that the test for *relatedness* of claims is not precise", *Schwarz v. Secretary of Health & Human Services*, 73 F.3d 895, 903 (9th Cir. 1995)(emphasis added), "the focus is to be on whether the unsuccessful and successful claims arose out of the same 'course of conduct.'

24

If they didn't they are unrelated under *Hensley*." *Id*. In other words, "[c]laims are *unrelated* [only] if the successful and unsuccessful claims are 'distinctly different both legally and factually." *Webb v. Sloan*, 330 F.3d 1158, 1169 (9th Cir. 2003), citing *Schwarz* at 901-02.

In *Hensley,* the Supreme Court "recognized that work on different aspects of a case often overlaps, and that '[m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim by claim basis.'" *Webb*, 330 F.3d at 1169, citing *Hensley*, 461 U.S. at 435.  Especially where, "it is likely that some of the work performed in connection with the unsuccessful claim also aided the work done on the merits of the successful claim." *Schwarz,* 73 F.3d at 903.

The Ninth Circuit is clear, "plaintiffs are to be compensated for attorney's fees incurred for services that contribute to the ultimate victory in the lawsuit. Thus, even if a specific claim fails, the time spent on that claim may be compensable in full or in part, if it contributes to the success of other claims." *Cabrales v. County of Los Angeles*, 935 F.2d 1050, 1052 (9th Cir. 1991). Here, the Bankruptcy Court correctly noted the Moons' claims were "inextricably linked" and awarded most of the requested attorney's fees (EOR Vol. II, 'H', p.10, ln. 8-9), *Moons,* 642 BR at 36.

Not surprisingly, Rushmore's brief cites to the BAP's remand and *In re Stinson*, 295 BR 109, 118-119 (9th Cir. BAP 2003) *rev'd in part on other grounds*, 128 F. App'x 30 (9th Cir. 2005). However, the problem with any reliance on *Stinson* is that the Ninth Circuit Court of Appeals has *other* decisions that better explain which issues are considered related. Because in some bankruptcy cases, only a single claim will present. In other cases, the debtor's claims for relief will involve a *common core of facts* or will be based on related *legal theories*. This was such a case.

Besides, *Stinson* involved an adversary complaint containing *six* causes of action.[14]  Therefore, it was obviously a lot more difficult to segregate the time of *six* different causes of action. In sharp contrast, the Moons only have two-related claims.

However, the Ninth Circuit has cases more on point that override *Stinson*, which this Court is not even bound by. Thus, the Bankruptcy Court adhered to those Ninth Circuit cases, because ultimately the "[Ninth Circuit] Court is not bound by a [BAP] decision." *In re Cardelucci*, 285 F.3d 1231, 1234

---

14. These included: (1) seeking to enjoin Bi-Rite from enforcing the State Judgment; (2) seeking damages for Bi-Rite's violation of the discharge injunction; (3) alleging that Bi-Rite obtained the State Judgment in violation of the automatic stay; (4) alleging that CPL's enforcement efforts constituted deceptive and unfair practices under federal and state laws; (5) claiming an invasion of privacy right against CPL; and (6) asserting severe emotional distress.

(9th Cir. 2002). In fact, the BAP also long recognized that Ninth Circuit decisions are binding on them, rather than the other way around.  See e.g., *In re Ball*, 185 B.R. 595, 597-98 (9th Cir. BAP 1995) ('[w]e will not overrule our prior ruling unless a Ninth Circuit Court of Appeals decision, Supreme Court decision, or subsequent legislation has undermined those rulings"). Therefore, the BAP's *Stinson* decision does *not* control the attorney fee issue. Because, as shown below, there are some published Ninth Circuit cases that impliedly overrule *Stinson*.

Further, the Ninth Circuit has held, that a reduction of fees is *not* required because the claims of the successful plaintiff, (Adnette Moon), were essentially *identical* to the claims of the unsuccessful party (Willie Moon), represented by the same attorney, concerning the same dispute and would have required the same amount of trial preparation regardless of whether the other plaintiff remained a party. *Cinevison Corp. v. City of Burbank,* 745 F.2d 560, 581 (9th Cir. 1984), *cert. denied*, 471 U.S. 1054 (1985).  That is the exact scenario in this case.

Critically, in *Moon*, the stay violation and discharge injunction were *not* "distinctly different both legally and factually." *Webb* 330 F.3d at 1159. Instead, the claims in the Moons' motion "arose out of the same course of

27

conduct" by Rushmore. *Schwarz,* 73 F.3d at 903. Critically, the Ninth Circuit has "not required commonality of *both* facts *and* law before concluding that unsuccessful and successful claims are related." *Webb*, 330 F.3d at 1168 (emphasis added). Thus, claims are considered related in *either* situation. "[T]he test is whether relief sought on the unsuccessful claim 'is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief granted is premised.'" *Thorne v. City of El Segundo*, 802 F.2d 1131, 1141 (9th Cir. 1986).

Of note, the Moons not only prevailed on their stay violation claim, but they *also* prevailed against Rushmore on the other basis it sought, that Rushmore violated the discharge injunction (EOR Vol. II, 'H', p.27, ln.9-11, fn.47) *Moon,* 642 BR at 37, fn.23, *Moon*, 613 BR at 361. The fact that the Court did not award damages for Rushmore's discharge violation does *not* mean the Moons did not prevail on that issue. It was only because the court could not determine a date on which to calculate the amount of damages that none were awarded[15] (EOR Vol. II, 'H', p.27, fn.47).

The Ninth Circuit warns, that "a district court should *not* reduce the lodestar merely because the prevailing party did not receive the type of relief it requested."*Gates v. Deukmejian*, 987 F.2d 1392, 1404 (9th Cir. 1992). Thus,

---

15. This is an issue in the Moons' cross-appeal (see Supra).

the bankruptcy court correctly awarded most of the attorney fees related to the Moons' Motion for Contempt, which included their discharge violation claim.

The Ninth Circuit has held, "the district court did not err in ruling that [plaintiff's] claims all involved the same conduct and were sufficiently related to one another to entitle him to fee's for *all* the work performed." *Watson v. County of Riverside*, 300 F.3d 1092, 1096-97 (9th Cir. 2002). Here, because the motion for contempt involved the same conduct by Rushmore, i.e. both calls and letters, pre- and post discharge, its stay and discharge violations were sufficiently related and *inextricably intertwined. In re Dawson*, 346 BR 503, 518 (Bankr. N.D. Cal. 2006). Based upon these Ninth Circuit cases, the attorney fees for the Moon's motion for contempt that the Bankruptcy Court awarded were proper.

So, although the Moon's sought additional relief broader than what they received in their Motion, this fact alone does *not* render de minimis any monetary award and policy change that they in fact may secure. See *Hensley*, 461 U.S. at 431 ("It also is not legally relevant that plaintiffs' counsel expended a certain limited amount of time pursuing certain issues of fact and law . . . upon which plaintiffs ultimately did not prevail. Since plaintiffs prevailed on the merits and achieved excellent results for the represented class, plaintiffs'

counsel are entitled to an award of fees for all time reasonably expended . . . .") (quoting *Davis v. County of Los Angeles*, 8 E.P.D. ¶¶ 9444 at 5049 (C.D. Cal.1974)). Because the claims of Adnette Moon and Willie Moon were *inextricably linked*, the Court did not abuse its discretion in granting almost all of the attorney's fees requested.

### 3. The attorney fee award was reasonable regardless of Adnette Moon's damages award

Even if Adnette Moon's actual damages were lower, her attorney fee claim would still not be unreasonable. For example, in *Morales v. City of San Rafael*, 96 F.3d 359 (9th Cir. 1996), the plaintiff was awarded $17,500 in compensatory damages and nearly $140,000 in attorneys' fees and costs. More recently, after awarding $5,000 in emotional distress damages, $39,000 in property rights damages, $10,000 in punitive damages, a bankruptcy court awarded $369,346.90 in attorney's fees for a stay violation. *In re Parker*, 2021 WL 1090421 (N.D. Cal. March 22, 2021). In fact, the U.S. Supreme Court tells us that there is no absolute requirement that attorney's fees in civil rights cases be proportionate to the damages awarded.  *City of Riverside v. Rivera*, 106 S.Ct. 2686, 2697-98 (1986). The same should hold true under Section 362(k)'s fee-shifting statute.

Not surprising, attorney's fees awarded in other fee-shifting consumer

protection statutes have determined that the allowed attorney's fees can be much greater than the actual damage award. *Gradisher v. Check Enforcement Unt.*, 2003 WL 187416 (W.D. Mich. Jan. 22, 2003) (FDCPA)($69,872 in fees where consumer's recovery was only statutory damages of $1,000); *Armstrong v. Rose Law Firm, P.A.*, 2003 WL 31050583 (D. Minn. Sept. 5, 2002) (FDCPA)(over $43,000 in fees where consumer received maximum statutory damages of $1,000); *Nigh v. Koons Buick Pontiac GMC*, 478 F.3d 1183 (4th Cir. 2007)(TILA)($85,083.60 in attorneys fees and damages award of $1,000).[16]

As the California Supreme Court has held, attorney's fees awarded by the trial court could properly be included as compensatory damages for

16. At least three federal appellate circuits, the Third, Tenth, and Eleventh have reached the same conclusion. These include *Willow Inn, Inc. v. Public Service Mutual Insurance, Co.*, 399 F.3d 224 (3rd Cir. 2005)($2,000 in compensatory damages, attorneys fees of $135,000 and $150,000 in punitive damages); *Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.*, 244 F. App'x 424, 435-437 (3rd Cir. 2007); *Continental Trend Resources Inc. v. Oxy USA, Inc.*, 101 F.3d 634 (10th Cir. 1996); and *Action Marine, Inc. v. Continental Carbon, Inc.* 481 F.3d 1302, 1308 (11th Cir. 2007)($1.9 million in compensatory damages and $1.3 million in attorney fees $17.5 million in punitive damages). Also, a number of state court decisions have held the same. See *Kirkpatrick v. Strosberg,* 894 N. E.2d 781, (Ill. App. Ct. 2008 ("although no compensatory damages were awarded, $83,000 in attorneys fees and $300,000 in punitive damages were awarded making the ratio of punitive damages just over 3 ½ times attorney fees," an amount well within permissible ranges); *Quicken Loans, Inc. v. Brown*, 737 S.E.2d 640 (W. Va. 2012)($17,000 in restitution, $600, 000 in attorneys fees and $2.2 million in punitive damages); *Clausen v. Icicle Seafoods*, Inc. 272 P.3d 837 (Wash. 2012)(en banc)($37,420 in compensatory damages, $387, 558 in attorneys fees and $40,547.57 in costs and $1.3 million in punitive damages).

purposes of determining the punitive to compensatory damages ratio. *See Nickerson v. Stonebridge Life Insurance Co.*, 63 Cal. 4th 363 (2016). Adding, there was "no reason to exclude *Brandt* (attorney) fees from the calculation of the proper ratio of punitive damages, . . ." *Id* at 376. *Brandt v. Superior Court*, 37 Cal. 3d 813, 817 (1985). Critically, this was *regardless* of the timing of the fee award. *Nickerson* at 368. In other words, the punitive damages can be redetermined after the attorney's fees are awarded. Here, that is what the Bankruptcy Court did. Thus, again the bankruptcy court did not abuse its discretion in awarding the amount of attorney's fees that it did.

## C. Rushmore's new issue is waived

For the first time on appeal, Rushmore comes up with an argument that Adnette Moon had no pre-litigation injury for an award of attorney's fees to even be permitted (Op. Br. p.33, ln.21-25). However, Rushmore has waived this issue, because it was *never* raised in relation to the Moons' initial request for attorney fees (EOR, Vol. VI, 'U'). Generally, an appellate court will not hear an issue raised for the first time on appeal. *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992). And not surprisingly, this issue was *never* raised by Rushmore at the BAP, "Rushmore does not challenge the Bankruptcy Court's ruling . . . [on] the award of compensatory damages of $742.10" (EOR,

Vol. III, 'P', p.10) and, as shown below, was *not* raised in any of Rushmores three (3) briefs on remand.

In fact, Rushmore *specifically* approved Adnette's damage award. For instance, in its briefs on remand, Rushmore repeatedly acknowledged that "Adnette won $742.10" (EOR, Vol. II,'D', p.9, ln.5, p.15, ln.3). Further, "[f]ollowing remand, Adnette is entitled to $742.10 in compensatory damages." (EOR Vol. II, 'F', p.4, ln.9).Also,"Adnette is only entitled to $742.10 in compensatory damages." (EOR Vol. II, 'F', ln.5-6)."And following the appeal Adnette is entitled to $742.10 in actual damages for a stay violation." (EOR Vol II, 'D', p.4, ln.18-19). In fact, "Rushmore [admits it] did not appeal the $742.10 award." (EOR Vol. II, 'D', p.10, ln.16). These are all judicial admissions. Therefore, besides having waived this issue, Rushmore is now judicially estopped from attempting to make its *new* argument in this appeal. *Ah Quin v. Cnty. of Kauai Dept. of Transp.*, 733 F.3d 267, 270-71 (9th Cir. 2013).

Finally, with little other support for its argument, Rushmore digs up a 15 year old bankruptcy case from Alabama, *In re Hutchings*, 348 BR 847 (N.D. Ala. 2006), and labels it "seminal" (Op. Br. p.34, ln.22). In the process, Rushmore ignores that it harassed the Moons for more than half-a-decade (i.e.

2014 to 2019) and only relinquished servicing a couple of months before their motion for contempt was filed (EOR Vol. III 'M').

## D. There is no reason to withdraw the reference

Finally, Rushmore accuses the Moons of forum shopping (Op. Br. p.48, ln.27). As such, it asks this Court to withdraw the reference and keep this case if a remand is part of its decision. But isn't that forum shopping by Rushmore? Besides, is the real reason because the bankruptcy court could reconsider the punitive damages and award more if it comes back down to it (EOR, Vol. II, 'H', p.29, ln.27-28, p.30, ln.1-2). Further, Rushmore alleges it would "speed a final resolution." (Op. Br. p.41, ln.4). However, this is *not* the fact finding court, the Bankruptcy Court is. Thus, any additional remand and fact finding must be done below. Instead, this is a disguised recusal motion. But "judicial rulings alone almost never constitute [a] valid basis for a bias or partiality recusal motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994). Thus, with no basis to do so, this Court should not withdraw the reference.

## VIII
## Conclusion

The Bankruptcy Court's punitive damages award of 7 to 1 (or 2.48 to 1) does *not* violate due process. Further, Rushmore already accepted Adnette's damage award and cannot bring up a new issue on appeal. Thus, that issue is

waived. In addition, the court properly awarded the amount of attorney's fees it did because the Moons' claims were inextricably linked. Therefore, the Bankruptcy Court's decision should be affirmed in its entirety. In addition, withdrawal of the reference is not warranted.

## Cross-Appeal

## I

## Summary of Argument

The BAP erred in holding Willie Moon had no standing to receive damages under §362(k), when he was not only an individual,[17] but also a debtor, who received the brunt of Rushmore's harassment. Thus, Willie Moon had standing to receive damages for Rushmore's stay violation even though he was not on Rushmore's loan. Further, Willie Moon had prudential standing to raise a stay violation claim because he, was in the "zone of interest" that the automatic stay protects. And finally, Willie Moon's income was property of the estate and protected by the automatic stay. Therefore, based upon any of these, Willie Moon's standing should be recognized and his damages award reinstated.

Unfortunately, the Bankruptcy Court did not award damages for Rushmore's discharge violation, but *only* because the Moons could not pinpoint when Rushmore received notice. However, the U.S. Supreme Court has held that willful blindness can equate to actual knowledge. Therefore, the Bankruptcy Court should have used the actual date of discharge, based upon it repeatedly noting Rushmore's willful blindness to the Moons' bankruptcy.

---

17. 11 U.S.C. §362(k) holds, "an *individual* injured by a willful stay violation"

Finally, because Rushmore's conduct during the Moons' bankruptcy continued the same *exact* way *after* their discharge, the Bankruptcy Court erred by not holding that Rushmore committed a continuing stay violation.

## II

### Issues

1. Whether Willie Moon has standing for damages under §362(k), as an individual and a debtor, also by being in the "zone of interest" protected by the stay, and because his income was property of the estate.

2. Whether the Bankruptcy Court should have held, that because of Rushmore's willful blindness, it had actual knowledge of the Moons' discharge on the day it was entered. As such, a determination of damages was warranted.

3. Whether Rushmore's violation of the Moons' discharge was also a continuing stay violation, because it engaged in the same acts that violated the automatic stay.

## III

### Standard of Review

Whether Willie Moon has standing under §362(k) is reviewed *de novo*. *In re Chugach Forest Prods., Inc.*, 23 F.3d 241, 244 (9th Cir. 1994). Questions of law are determined de novo, meaning that review is independent, with no deference given to the trial court's conclusion. *In re Onecast Media, Inc.*, 439

F.3d 558, 561 (9th Cir. 2006).To the extent factual issues need resolution, the panel must determine if a court abused its discretion.

The denial of sanctions for a discharge injunction violation is reviewed for an abuse of discretion *In re Retz*, 606 F.3d 1189, 1196 (9th Cir. 2010). In determining whether a bankruptcy court abused its discretion, the court reviews whether the bankruptcy court applied the correct rule of law. *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009)(en banc). It then determines whether the lower court's application of that rule was illogical, implausible, or without support in inferences that may be drawn from the facts in the record. *Id* (quoting *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 577 (1985).

**IV**

**Argument**

## 1. Willie Moon has standing for 362(k) damages

Initially, the Bankruptcy Court awarded Willie Moon emotional distress damages and punitive damages for Rushmore's "reprehensible" behavior towards the Moons. *In re Moon*, 613 BR 317, 360 (Bankr. D. Nev. 2020). However, the Ninth Circuit BAP reversed that decision and erroneously held Willie Moon had no standing for damages, because he was not on the Rushmore loan (EOR Vol. III, 'P', p.15).

### A. Contrary to the BAP's holding Willie Moon has standing on several grounds

### (i) Willie Moon is an individual and a debtor[18]

Willie Moon must show standing in order to pursue a bankruptcy stay violation. Standing under §362(k) is simple. In accordance with the statute, to receive damages under §362(k), one *only* needs to be an *individual* who was *injured* by a violation of the stay. 11 U.S.C. §362(k). Ironically, the statute does *not* even say one has to be a debtor to receive damages. But here, Willie Moon was *both* an individual *and* a debtor. Therefore, as an individual who was injured by Rushmore's incessant collection calls and collection letters, and also as a debtor, wasn't Willie Moon entitled to damages?

Besides, the automatic stay is designed to benefit trustees and *debtors*. See *In re Mwangi*, 764 F.3d 1168, 1173 (9th Cir. 2013) ("The stay [thus] protects the debtor . . ."). Although the Ninth Circuit's *Pecan Groves*[19] decision appears to indicate that no other party can *attack acts* in violation of the stay, other courts have voiced concern over this interpretation. Because, *Pecan Groves* merely held that "a creditor has no independent standing to appeal an adverse decision regarding a violation of the automatic stay." *Id* at 245. Thus,

---

18. The Moons preserved this issue after remand (EOR Vol. II, 'C', p.2, ln.2-5).

19. *In re Pecan Groves*, 951 F.2d 242 (9th Cir. 1991).

*Pecan Groves* was limited to a case where, in a bankruptcy proceeding, the trustee and some creditors challenged a stay-violative act, which the bankruptcy court denied. *Pecan Groves,* 951 F.2d at 244. The creditors appealed, but the trustee did *not*, so the creditors *alone* had no standing. *Id.* at 245.

However, there was no analysis of constitutional *or* prudential standing in *Pecan Groves*. The holding was focused on the test for determining whether a party has standing *to appeal*—not whether it has standing generally. In fact, *Pecan Groves* "'has been misstated for the proposition that the automatic stay is solely for the benefit of the debtor, and a creditor cannot have standing under § 362(h). . . . This Court finds ample authority for the proposition that the automatic stay is intended to benefit creditors, as well as debtors.' " *In re Leeds*, 589 B.R. 186, 195 n. 18 (Bankr. D. Nev. 2018), *citing In re Int'l Forex of Cal., Inc.*, 247 B.R. 284, 291 (Bankr. S.D. Cal. 2000). As the *Leeds* court further explained, "Rote application of the *Pecan Groves* holding leads to the anomalous situation where the same act in violation of the automatic stay is void for some parties, but not void for others." *In re Leeds*, 589 B.R. at 200.

In a concurrence, Judge Vandyke of the Ninth Circuit noted, that limiting the stay "[is] inconsistent with our more recent bankruptcy

40

jurisprudence." *Bank of New York Mellon v. 732 Hardy Way Trust*, 4 F.4th 1229, 1236 (9th Cir. 2021). Judge Vandyke added, "the principles underlying *In re Globe's* and *In re Pecan Grove's* conclusions . . . are clearly outdated and inconsistent with our more recent precedent," *Id* 4 F.4th at 1237. Although *In re Globe*, 867 F.2d 556, 560 (9th Cir. 1989) held that "section 362 . . . does not confer any rights to outside parties", here, Willie Moon is not an outside party, but *is* a debtor! Thus, the stay should have been extended by the BAP to Willie Moon based upon more recent Ninth Circuit precedent.

### (ii) Willie Moon has standing under the Bankruptcy Code to rely on the automatic stay

To the extent, a debtor who is not on a loan lacks standing generally to rely on the automatic stay, it should be analyzed under this Court's framework in *Thorpe* and the United States Supreme Court's precedent on prudential standing requirements. The Ninth Circuit has held, to have standing under the bankruptcy code, three requirements must be met (1) the person must be a "party in interest" as defined by §1109(b) of the bankruptcy code; (2) Article III standing requirements must be satisfied; and (3) prudential standing requirements must be met. *In re Thorpe,* 677 F.3d 869, 884 (9th Cir. 2012).

Willie Moon clearly meets the standing requirements under the Ninth Circuit's framework as set forth in *Thorpe*. Willie Moon, as a debtor, is a

"party in interest" to the bankruptcy. *See* 11 U.S.C. § 1109(b)(defining "parties in interest" to include debtors). Besides, Willie Moon has Article III standing because he suffered an injury in fact—emotional distress damages—because of Rushmore's relentless stay-violating collection calls and collection letters. And these can be redressed by the Bankruptcy Court.

That leaves only the prudential standing analysis. The prudential standing principle is "a judicially self-imposed limit[] on the exercise of federal jurisdiction." *Thorpe,* 677 F.3d at 888. One of the prudential standing requirements is that a plaintiff's grievance *arguably* falls within the "zone of interests" protected or regulated by the statutory provision or constitutional guarantee invoked in the suit. *Id.* Thus, a party has standing under the prudential doctrine so long as the injury alleged is "*arguably* related to the interests the statute protects." *See Lexmark In'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (emphasis added); *see also Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1301 (2017).

" '[P]rudential standing' is [technically] a misnomer." *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 127 (2014). In *Lexmark*, the Supreme Court "rejected the 'prudential standing' label and made clear that whether a plaintiff's claims are within a statute's zone of interests is not a

*jurisdictional* question." *Pit River Tribe v. Burea of Land Mgmt.,* 793 F.3d 1147, 1156 (9th Cir. 2015). In fact, "[w]hether a plaintiff comes within 'the "zone of interests" is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred *cause of action* encompasses a particular plaintiff's claim." *Lexmark Int'l*, 572 U.S. at 127 (emphasis added).

Further, the United States Supreme Court has explained that the "zone of interests" test is "not 'especially demanding.'" *Lexmark Int'l*, 572 U.S. at 130. While the breadth of the zone of interests test may vary depending on the provisions of law at issue, it is clear, Debtor, Willie Moon's interests are, at the very least, "arguably" related to interests the automatic stay was designed to protect. *See also St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533, 540 (5th Cir. 2009). Here, because Willie Moon's grievance "fall[s] within the zone of interests protected or regulated by the statutory provision . . . invoked in the suit [.]", he has standing. *Bennett v. Spear*, 520 U.S. 154, 162 (1997).

### B. Willie Moon's income is property of the estate

In addition, the automatic stay protects "any act to obtain property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. §362(a)(3). Property of the estate is defined as "all

legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. §541(a)(1). Here, the BAP agreed, that some of Willie Moon's income, that he contributes to their plan payments, and to pay the mortgage "post-confirmation" remained and are property of the estate and protected by the stay (EOR Vol. III, 'P', p.14). Therefore, contrary to the Ninth Circuit BAP's holding, and its reliance on *In re Heath*, 115 F.3d at 524, Willie Moon's income is protected by the automatic stay (EOR Vol. III, 'P', p.14-15). See 11 U.S.C. §1306(a) (post petition income is property of the estate).

Not surprisingly, many courts have found that a conflict exists between §§1327(b) (confirmation of the plan) and 1306(a) (post petition income). *See Barbosa v. Solomon*, 235 F.3d 31 (1st Cir. 2000); *Telfair v. First Union Mortgage Corp.,* 216 F.3d 1333, 1340 (11th Cir.2000); *Black v. United States Postal Serv. (In re Heath),* 115 F.3d 521, 524 (7th Cir.1997); *Bank of Marshaltown, Iowa v. Neiman*, 1 F.3d 687, 690 (8th Cir. 1993). Interestingly, it appears "[t]he Fourth Circuit has expressly avoided reconciling the interplay between §§1306 and 1327(b)." *In re Goldton*, 627 BR 841, 864 (Bankr. D.S.C. 2021). See also *Annese v. Kolenda,* 212 B.R. 851, 853 (W.D.Mich.1997); *In re Petruccelli,* 113 B.R. 5, 9 (Bankr.S.D.Cal.1990).

The alleged conflict involves whether income received by the debtor

post-confirmation is property of the debtor or the estate under §§1327(b) and 1306(a)(2). Under §1306(a)(2), all of the debtor's post-petition income is property of the estate until the case is closed, dismissed or converted. On the other hand, §1327(b) provides that unless stated otherwise in the plan, the confirmation of the plan vests all of the property of the estate in the debtor.

Courts have generally dealt with this conflict using one of four approaches: (1) the "reconciliation" approach; (2) "estate termination" approach; (3) "estate transformation" approach; and (4) "estate preservation" approach.

Although, the Ninth Circuit has not directly addressed this issue of whether postpetition income is protected by the automatic stay, it has given us some insight on its view. *In re Jones,* 657 F.3d 921 (9th Cir. 2011). In *Jones*, this Circuit "affirmatively decline[d] the estate preservation approach." *Jones,* 657 F.3d at 928. Then added, "[r]egardless of whether and to what extent the estate continues as a legal entity post-confirmation, we hold that, at the very least, *some* estate property revests in the debtor at confirmation." *Id.* (emphasis added). Thus, a debtor becomes "the owner of her property at confirmation, except as to those sums specifically dedicated to fulfillment of the plan." *Id.*

However, the Ninth Circuit specifically stated it was not ruling on which one of the remaining views it would take on the tension between 11 USC §1306(a) and §1327(b). See *Jones* 657 F.3d at 927. Despite this, the BAP erred in holding that no matter what view the Ninth Circuit took, Willie Moon's income, which was used to help pay their plan and their bills, was not protected by the stay (EOR Vol. III, 'P', p.14-15). But, as shown below, the view the Ninth Circuit decides upon *does* matter.

**(1) Reconciliation approach**

The reconciliation approach also known as the "modified estate preservation" holds, that estate property vests in the debtor upon plan confirmation, but property acquired after confirmation becomes property of the estate pursuant to §1306(a). *See Barbosa,* 235 F.3d at 36-37. It is only the "reconciliation" approach that gives full meaning to the plain text of both §§1306(a) and 1327(b). Thus, the reconciliation approach harmonizes the two statutory provisions. It correctly finds that there is no conflict between §§1306(a) and 1327(b). Notably, it has been adopted by three Circuit Courts. As explained by the Eleventh Circuit in *Waldron:*

> While the case is pending, the post-petition property ... [is] added to the estate until confirmation, the event that triggers [section] 1327(b) and "vests" the property of the estate in the debtor. That is, the property interests comprising the pre-confirmation estate

> property are transferred to the debtor at confirmation, and this
> "vesting" is free and clear of the claims or interests of creditors
> provided for by the plan, [section] 1327(b), (c). Finally, the property
> of the estate once again accumulates property by operation of
> [section] 1306(a) until the case is "closed, dismissed, or converted."

*In re Waldron,* 536 F.3d 1239, 1243 (11th Cir.2008) (quoting *City of Chicago*

*v. Fisher (In re Fisher),* 203 B.R. 958, 962 (N.D.Ill.1997)). Thus, under

*Waldron,* future, post-confirmation earnings are property of the estate.

The Moons argue that the Ninth Circuit would, and should, take the

reconciliation approach, because it is the only one of the four approaches that

interprets §§1327(b) and 1306(a)(2) in harmony. These two statutes can be

reconciled by treating all post-confirmation, *future income* as property of the

estate. *See also In re Reynard,* 250 B.R. 241, 246 (Bankr.E.D.Va. 2000) ("The

only manner in which the two provisions can be read in harmony is if the

assets of the chapter 13 estate as of the date of the confirmation of the chapter

13 plan vest in the debtor, the estate continues and the assets set out in

§1306(a) acquired after confirmation become property of the chapter 13 estate

when acquired."). Thus, at confirmation, all of the property that is *currently*

property of the estate could vest in the debtor; and all of the debtor's future

income would still be estate property.

Additionally, the reconciliation approach makes practical sense based

on the primary objectives of chapter 13. "One of the primary purposes of Chapter 13 . . . is to offer debtors an incentive to gradually repay their obligations rather than to liquidate their assets under Chapter 7." *In re Burba,* 1994 WL 709314, *17 (6th Cir. Nov. 10, 1994). Instead of liquidating pre-petition assets through chapter 7, qualified debtors may keep many of their assets and pay for them through the chapter 13 plan. In order to retain title to their property, debtors must commit to pay their future disposable income to their creditors for up to five years. 11 U.S.C. §1322(d). "Thus, there is a trade: The debtor retains assets and pledges income. A portion of this future stream of income is then used to pay creditors with liens on retained assets. The result is a coherent legislative framework. The assets that the debtor keeps under the plan are vested in the debtor; future income is vested in the estate. Thus the assets and the income are owned by the proper parties under the literal interpretation of the Bankruptcy Code. The symmetry is not only pleasing to the mind, but consistent with Congressional language." *In re Rodriguez*, 421 BR 356, 375 (Bankr. S.D. Tex. 2009).

Besides the Eleventh Circuit in *Waldron,* the First and Eight Circuits have also adopted the reconciliation approach. The First Circuit has recognized that "by virtue of sections 1327(b)(c), property of the estate at the

time of confirmation vests in the debtors free of any claims from the creditors." *Barbosa v. Solomon,* 235 F.3d 31, 36 (1st Cir.2000). Nevertheless, the First Circuit determined that "the *estate does not cease to exist ...* and it continues to be funded by the Debtors' regular income and post-petition assets as specified in section 1306(a)." *Id.* (emphasis added).

Similarly, in *Neiman,* the Eight Circuit held:

> We join the line of cases holding the estate continues to exist after confirmation of the Chapter 13 plan. Upon reviewing §1327 regarding the effect of confirmation, even if property of the estate vests in the debtor at confirmation, that does not necessarily mean that the estate no longer exists.

*Sec. Bank of Marshalltown Iowa v. Neiman,* 1 F.3d 687, 690 (8th Cir.1993).

In sharp contrast, the other approaches vary the plain text of the Bankruptcy Code. *See Morton v. Mancari,* 417 U.S. 535, 552 (1974)("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."); *United States v. Caldera-Herrera,* 930 F.2d 409, 411 (5th Cir.1991) ("Where possible statutes must be read in harmony with one another so as to give meaning to each provision.").

And if the Ninth Circuit follows the reconciliation approach, Willie

Moon's income *is* property of the estate. As such, the BAP erred, because Rushmore violated Willie Moon's automatic stay, by attempting to exercise control over property of the estate in pressuring him to pay on its claim with his postconfirmation income.

### (2) Estate termination approach

The second approach is the estate termination approach. Under this approach, all property of the estate becomes property of the debtor upon confirmation and ceases to be property of the estate. *Shell Oil v. Capital Fin. Servs.,* 170 B.R. 903, 905-06 (S.D.Tex.1994). This approach "follows section 1327(b) to the letter." Robert A. Leflar, *Section 1327(b) Says What? And Related Issues in the Termination or Extension of the Chapter 13 Bankruptcy Estate,* 2000 Ark. L. Notes 55, 58 (2000). *Shell Oil* clearly demonstrates the significance attributed to §1327(b) under the estate termination approach: "When the court confirms a plan, the property of the estate vests in the debtor unless the plan says otherwise. 11 U.S.C. § 1327(b). When property vests in the debtor, it is no longer property of the estate." *Shell Oil,* 170 B.R. at 905-06.

The problem is that this approach does *not* even mention §1306 or its effect on termination. Besides, the issue in *Shell Oil* did not involve post-petition wages. *Id.* 170 BR at 905. Therefore, "[t]he estate termination

approach elevates §1327(b) to the point that it cannot be reconciled with §1306(a). Essentially, this approach amends §1306(a) to provide that post-petition earnings and property are property of the estate until the case is closed, dismissed, converted or until a plan is confirmed." *Rodriguez,* 421 BR at 375.

But this approach would entail amending the statute. *See United States v. Cavada,* 821 F.2d 1046, 1048 (5th Cir.1987)("Even if two statutes conflict to some degree, they must be read to give effect to each, if that can be done without damage to their sense and purpose, unless there is evidence either in the text of the statute or the legislative history that the legislature intended to repeal the earlier statute and simply failed to do so expressly."). There is no evidence that Congress intended to supersede or amend §1306(a) through §1327(b). Thus, the Moons argue that the Ninth Circuit would reject this approach.

### (3) Estate transformation approach

The third way courts have viewed this conflict, is through the estate transformation approach. It holds that property necessary for the execution of the plan remains property of the estate after confirmation, and the remaining non-essential property becomes property of the debtor at

confirmation. Thus, the chapter 13 estate terminates on confirmation of the plan, except as is necessary to fund payments to be made through the chapter 13 trustee. "The estate transformation approach ... protects the interests of both the debtor and the creditors." *Telfair,* 216 F.3d at 1340. In the end, this approach is a problematic compromise between the estate termination and estate preservation approaches. Besides, *Telfair,* is an Eleventh Circuit opinion that preceded *Waldron* by eight years. And *Waldron* explicitly held that post-petition earnings *remain* estate property. *Waldron,* 536 F.3d at 1243.

In the process, the Eleventh Circuit's *Waldron* decision revisited and clarified *Telfair's* use of the estate transformation approach: "Our analysis is not ... governed by the estate transformation approach that we adopted in *Telfair* ... We adopted that approach to resolve the tension between §§1306(a) and 1327(b) regarding *property interests that existed at confirmation*." *Waldron,* 536 F.3d at 1242 (emphasis added). *Waldron* added that "[w]e did not address in *Telfair* entirely new *property interests acquired by the debtor after confirmation* and unencumbered by any preexisting obligation." *Id.* (emphasis added). Accordingly, *Telfair* should not be considered a controlling circuit court decision.

In *Heath,* which the BAP approvingly cited, the Seventh Circuit adopted the estate transformation model to resolve what it viewed was a conflict between §§1306(a) and 1327(b). *Heath,* 115 F.3d at 524. But with minimal analysis, the Seventh Circuit "read the two sections, 1306(a)(2) and 1327(b), to mean simply that while the filing of the petition for bankruptcy places all the property of the debtor in the control of the bankruptcy court, the plan upon confirmation returns so much of that property to the debtor's control as is not necessary to the fulfillment of the plan." *Heath,* 115 F.3d at 524.

Finally, there are practical problems associated with the estate transformation approach:

> Section 1306(a) itself does not distinguish between property that is necessary for the success of the chapter 13 plan and property that is not necessary. *Fisher, supra,* at 962-63. If any estate remains by virtue of §1306(a) after confirmation, then all the property enumerated in §1306(a) should become property of the post-confirmation chapter 13 estate. There is also a practicable problem inherent in limiting the post-confirmation estate only to property necessary for the success of the chapter 13 plan. What property is necessary for the success of the chapter 13 plan? In a joint case, in the absence of a wage order under §1325(c), which debtor's wages are protected by the automatic stay? In an individual case where the debtor holds more than one job, which paycheck is necessary for the success of the chapter 13 plan? Which one is not protected by the automatic stay and is subject to garnishment? There is nothing that distinguishes the debtor's paycheck from the co-debtor's paycheck or the debtor's primary paycheck from his secondary paycheck. Money is fungible.

*Reynard,* 250 B.R. at 247-48.

Therefore, the estate transformation approach fails to satisfy fundamental principles of statutory interpretation, and is really a "split-the-baby" approach that, in substance, improperly effectuates the amendment of both §§1306(a) and 1327(b). "[A]rguably, [the estate transformation] theory nullifies both §§1306(a) and 1327(b) by not giving full credit to either."[20] Under this approach, Section 1306(a) is amended to provide that property of the estate includes all property and earnings that (i) the debtor acquires post-confirmation and before the case is closed, dismissed or converted, *and* (ii) *is necessary for the execution of the bankruptcy plan.* Similarly, §1327(b) is amended by the estate transformation approach to provide "except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate *not necessary for the execution of the bankruptcy plan* in the debtor." But this Court is not authorized to amend legislation, or to interpret seemingly conflicting statutory provisions in a manner that has the effect of amending them, when the provisions can be reconciled. Thus, this approach would also be rejected by the Ninth Circuit.

---

20. *See* Blanche D. Smith, *Property Of The Estate-To Be Or Not To Be? That Is The Question The Trustee Asks Of Thee,* 21-Jan Am. Bankr.Inst. J. 28, 66 (2003).

Therefore, the sole question for this Court, is which of these three remaining approaches the Ninth Circuit would take on whether future, post-confirmation earnings are estate property. The answer should be the reconciliation approach that three Circuits have already adopted. Accordingly, Willie Moon's postconfirmation earnings are estate property. If so, the BAP erred and Rushmore violated the automatic stay as to Willie Moon, because its actions affected his income that contributed to their Chapter 13 plan.

## 2. Rushmore's continuing stay violation

In addition, the Bankruptcy Court and BAP erred in holding that Rushmore's stay violation, which started pre-discharge and continued post-discharge, was not a *continuing* stay violation "eligible for §362(k)(1) remedies." *In re LeGrand*, 612 BR 604, 613 (Bankr. E.D. Cal. 2020),(EOR Vol. III, 'P', p.29). Although the BAP acknowledged, a creditor can be liable for a continuing stay violation post discharge, it declined to do so here. Holding a continuing stay violation usually involves "some action to undo an earlier stay violation" (EOR Vol. III, 'P', p.29). But because the same exact contemptuous activity continued post-discharge, Rushmore failed to undo its earlier stay violation.

Obviously, Rushmore's actions did *not* suddenly become discharge

violations at the *expense* of its continuing stay violation. Although a discharge ends the stay, a pre-discharge stay violation does not end with the discharge if the same acts continue post-discharge, which is what happened here. Thus, Rushmore committed a continuing stay violation in addition to its discharge injunction violation.

Further, even post-discharge, Rushmore failed to acknowledge it violated the stay, forcing the Moons to resort to an evidentiary hearing to prove the stay violation. Thus, Rushmore's stay violation *continued* to the date of determination by the Court, which was post-discharge. Therefore, this Court should reverse the Bankruptcy Court and BAP on this issue. If this Court holds that Willie Moon had standing for Rushmore's stay violations, which it should for a number of reasons already discussed, it's postdischarge violations are continuing stay violations for which he would also have standing as would Adnette Moon.

## 3. Rushmore should be charged with knowledge of the discharge on the date it was entered because of its willful blindness

### A. Rushmore's willful blindness

The Bankruptcy Court also held that Rushmore's actions not *only* violated the stay, but *also* the discharge injunction (EOR Vol. II, 'H', p.10, fn.21), *Moon*, 617 BR at 361. But it did *not* hold that Rushmore lacked actual

knowledge of the discharge, only that it could not pinpoint the date Rushmore acquired that actual knowledge. *Id. Moon,* 617 BR at 352 The Court reasoned that it was therefore unable to determine a specific date of Rushmore's knowledge for purposes of determining damages.

However, the Court's ruling erred in two respects. One, willful blindness can equate to actual knowledge. And two, Rushmore had constructive knowledge which also can equate to actual knowledge.

The U.S. Supreme Court has held that "willful blindness" can still be the equivalent of "actual notice". "Today's opinion also does not preclude defendants from contending that evidence of 'willful blindness' supports a finding of 'actual knowledge'." *Intel Corp. Investment Policy Comm v. Sulyma,* 140 U.S. 768, 779 (2020); *Cf. Global-Tech Appliances, Inc. v. SEB S. A.,* 563 U.S. 754, 769 (2011). That's the exact situation here.

The Bankruptcy Court's decision repeatedly points out Rushmore's willful blindness. For instance, "[m]oreover, the court is not aware of any authority that would permit creditors to create a shield of ignorance to protect themselves from liability for violating the bankruptcy laws." (EOR Vol. III, 'N', p.40, ln.4-5), *Moon*, 617 BR at 348. The Court added, "[t]he evidence presented in the instant case reflects the reprehensible nature of Rushmore's

conduct . . . Yet Rushmore adopted express procedures to narrow the source of bankruptcy information that it is willing to acknowledge and does not even tell its borrowers what those sources are." (EOR Vol. III, 'N', p.57, ln.14-19), *Moon*, 617 BR at 360.

The Court further noted: "[i]n the instant case, Rushmore's witness as well as its consciously adopted Procedures Manual have established that this loan servicer will simply ignore information concerning a borrower's potential bankruptcy by limiting the sources of information it will recognize" (EOR Vol. III, 'N', p.59, ln.2-5), *Moon,* 617 BR at 361. All of these equate to willful blindness.

Since the Bankruptcy Court found that Rushmore hid its head in the sand, "the 'ostrich-like' tactic", after actual notice of the bankruptcy, it should have held it was on actual notice of the Moons' discharge on the day it was entered. *Id*, 617 BR at 348. Therefore, the Court erred in not awarding damages to the Moons for Rushmore's post-discharge acts, which violated the discharge injunction. Thus, Rushmore's willful blindness constituted its actual knowledge of the discharge on the date entered. As such, a reversal and remand is appropriate so that the Court may determine damages based upon the discharge date being the imputed date that Rushmore had knowledge of

the Moons' discharge.

Finally, as the *Taggart* court explained, "a party's record of continuing and persistent violations and persistent contumacy justified placing the burden of any uncertainty in the decree on the shoulders of the party who violated the court order" *Taggart*, 139 S. Ct. at 1802. Here, the Court erred in putting the burden on the Moons to prove the date Rushmore knew of the discharge violation (EOR Vol. III, 'N', p.46, ln.5-7), *Moon*, 617 BR at 352.

## B. Constructive notice can be actual notice

Further, since Rushmore had actual knowledge of the stay pre-discharge, it was on constructive notice of the discharge, as constructive notice of the discharge can be actual notice. Rushmore gives no reasons why the modern trend–recognizing a creditor's actual knowledge of the stay is not constructive knowledge of the discharge–is not applicable here. Thus, a reversal and remand is also appropriate on this basis. Therefore, under either scenario, the date Rushmore had notice of the discharge on the date it was entered i.e. Sept 28, 2016. So, based upon this now *known* date, the Court can award damages to both parties for Rushmore's discharge violation, if it chooses.

## IV

## Conclusion

As a debtor, and an individual, Willie Moon had standing for §362(k) damages. Alternatively, because Willie Moon is in the zone of interest of the automatic stay, he also had standing. Further, Willie Moon had prudential standing. And finally, under the reconciliation approach, Willie Moon had standing because Rushmore's actions affected his income i.e. property of the estate. Thus, under any of these scenarios, the BAP erred in reversing Willie Moon's damage award based upon standing.

In addition, since Rushmore engaged in the same actions postdischarge, that violated the automatic stay predischarge, it should have been charged with a continuing stay violation. Finally, because of its willful blindness, Rushmore was on actual notice of the discharge injunction on the day it was entered. Therefore, this Court should also reverse and remand the Bankruptcy Court's decision in order to consider potential damages for Rushmore's continuing stay violation and its discharge violation.

DATED this 17th day November, 2022.

/s/Christopher P. Burke, Esq.
Christopher P. Burke, Esq.
Nevada Bar. No.: 004093
218 S. Maryland Pkwy.
Las Vegas, NV 89101

## <u>Certification Required by Local Rule 10-6</u>
(Moon 2:22-cv-01126-APG and No. 2:22-cv-01155-ART(Cross-Appeal))

The undersigned certifies that the following parties have an interest in the outcome of this appeal. These representations are made to enable judges of the Panel to evaluate possible disqualification for recusal.

| | |
|---|---|
| Willie N. Moon | Appellee/Cross-Appellant |
| Adnette M. Gunnels-Moon | Appellee/Cross-Appellant |
| Rushmore Loan Management | Appellant/Cross-Appellee |
| Roosevelt Management Company, LLC | |

DATED this 17th day November, 2022.

/s/Christopher P. Burke, Esq.
Christopher P. Burke, Esq.

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the form and content requirements of Fed. R. Bankr. P. 8013(f)(3)(A), because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g), this document contains no more than 13,647 words.

2.     This  brief complies with the typeface requirements of Federal Rules of Bankruptcy Procedure 8015(a)(5) and the type-style requirements of Federal Rules of Bankruptcy Procedure 8015(a)(6) because it has been prepared in a proportionally spaced typeface using Georgia, 14-point font.

DATED this 17th day November, 2022.

*/s/ Christopher P. Burke, Esq.*
Christopher P. Burke, Esq.
218 S. Maryland Parkway
Las Vegas, NV 89101
(702) 385-7987
*atty@cburke.lvcoxmail.com*

62

## CERTIFICATE OF SERVICE

I hereby certify that on 17th day of November, 2022, I filed and served

the foregoing APPELLEES ANSWERING BRIEF AND CROSS-APPELLANTS

OPENING BRIEF through the CM/ECF system of the United States District

Court, District of Nevada of Nevada, to the individuals and/or entities at their

email addresses as set forth below:

James A. Kohl
Cami M. Perkins, Esq.
Howard & Howard Attorneys PLLC
3800 Howard Hughes Parkway, Suite 1000
Las Vegas, Nevada 89169
cperkins@howardandhoward.com
jkohl@howardandhoward.com

And

Leib M. Lerner
Jacob A. Johnson
Alston & Bird LLP
333 S. Hope Street, 16th Floor
Los Angeles, CA 90071
leib.lerner@alston.com
jacob.johnson@alston.com
Attorneys for
Rushmore Loan Management
Services, LLC

*/s/Christopher P. Burke, Esq.*
Christopher P. Burke, Esq.
218 S. Maryland Parkway
Las Vegas, NV 89101
(702) 385-7987
*atty@cburke.lvcoxmail.com*